Cashman vs. Ricigliano

8/5/2003                                                                       Michael Ricigliano, Esq.

Page 18

1   the file?
2       A. All the files? Some of the files? All files?
3   I don't know.
4       Q. And why is it that you don't know?
5       MR. SILBERBLATT: Are you referring now to
6   Cashman or just these five plaintiffs? It's not clear
7   in my own mind who you are referring to.
8       MS. FAULKNER: But it is clear in the
9   witness's mind, so please do not interrupt.
10      A. I think some of the files might have been sent
11  back to Arrow. Some might be in storage. I am not
12  sure.
13      BY MS. FAULKNER:
14      Q. Where would they be in storage if you kept
15  them?
16      A. We have like a company that stores files.
17      Q. Are there any files still on your premises as
18  active files?
19      A. No.
20      Q. Do you know who Rachel DeLeon is?
21      A. Personally?
22      Q. Yes.
23      A. No.
24      Q. You have never met her?
25      A. No.

Page 19

1       Q. Have you talked to her on the phone?
2       A. I don't know.
3       Q. Do you know who prepared the second page of
4   this document for everybody which is the transaction
5   description?
6       A. Personally?
7       Q. Yes.
8       A. No.
9       Q. Your firm didn't prepare it; is that right?
10      A. That's correct.
11      Q. I am going to show you what has been marked as
12  Plaintiffs' Exhibit 5, which is the affidavit that you
13  submitted in support of a motion to dismiss the case.
14  Do you recognize that document?
15      MR. SILBERBLATT: It seems to be missing the
16  first page. That is all.
17      MS. FAULKNER: I don't know. That is all I
18  have.
19      MR. SILBERBLATT: The missing first page would
20  be captions of the other cases. That is all. It is
21  strange he doesn't have -- it begins on page 2.
22      MS. FAULKNER: I don't think there was another
23  page. That was my question as well.
24      MR. SILBERBLATT: I think page 1 would have
25  been the multiple caption.

Page 20

1       Do you recognize that document?
2       THE WITNESS: Yes.
3       BY MS. FAULKNER:
4       Q. And if you look at page 10, is that your
5   signature?
6       A. Yes.
7       Q. And who is Ellen Savino?
8       A. She is a partner in my life firm.
9       Q. Are you a partner in your law firm?
10      A. Yes.
11      Q. When did you become a partner?
12      A. Year and a half ago. Two years ago.
13      Q. Approximately mid 2001?
14      A. Actually around 2002.
15      Q. Who else is a partner in your law firm at the
16  moment?
17      A. My father, Michael Ricigliano, and Joseph
18  Margiotta.
19      Q. Before you prepared this affidavit, did you --
20      MR. SILBERBLATT: Actually, could you -- did
21  he prepare this, because this is product of counsel.
22      MS. FAULKNER: I am sorry.
23      MR. SILBERBLATT: "Before you prepared it."
24  This is product of counsel, this affidavit. Your
25  question was, he prepared it.

Page 21

1       MS. FAULKNER: I see.
2       BY MS. FAULKNER:
3       Q. I assumed you prepared this.
4       You did not prepare this affidavit; is that
5   correct?
6       A. No.
7       Q. But you did sign it?
8       A. That's correct.
9       Q. And you did make sure when you signed it that
10  everything in it was true; is that correct?
11      A. That's correct.
12      Q. And what did you do to make sure that
13  everything in the affidavit was true before you signed
14  it?
15      A. I verified the information that was put in the
16  affidavit.
17      Q. And how did you verify it?
18      A. I went through records at our office. Some of
19  the information I knew already.
20      Q. Did you ask anyone at your office for help?
21      A. Yes.
22      Q. And who did you ask for help in making sure
23  that this affidavit was accurate?
24      A. Most of the staff.
25      Q. Can you tell me who are the staff and what you

6 (Pages 18 to 21)

Cashman vs. Ricigliano

8/5/2003                                                                              Michael Ricigliano, Esq.

Page 22

1  asked them about?
2      MR. SILBERBLATT: Objection.
3      A. The names of the staff?
4      BY MS. FAULKNER:
5      Q. Yes.
6      A. Ms. June Townsend.
7      Q. We can get the spelling of the names at the
8  end.
9          June Townsend. What is her function? What
10 did you ask her?
11     A. She is like a bookkeeper.
12         Miriam -- I don't know her last name. I am
13 sorry.
14     Q. What was her function, and what did --
15     A. She is secretary.
16         Fay Rycoff. She is a secretary who is now a
17 paralegal.
18         Christine Raffa, who is a -- was a paralegal.
19     Q. Does that indicate that she has changed
20 positions, or is Ms. Raffa not with the firm anymore?
21     A. No. She just graduated law school, so she
22 just took the bar, so she has her JD, but I don't know
23 if she passed the bar. So you know, she is just no
24 longer a paralegal anymore, I would say.
25         There is my father.

Page 23

1      Q. What did he know about the transaction?
2      A. Which transaction?
3      Q. About this, the material in the affidavit. I
4  am sorry.
5      A. I would just ask him you know, general
6  questions regarding the cases that we had handled, the
7  make up of the firm, different types of cases that we
8  handle.
9      Q. Anyone else?
10     A. Theresa Ladsco. She is a secretary. That is
11 about it.
12     Q. You said you consulted some records.
13        Did you consult the files of the Arrow cases?
14     A. I don't know if I consulted the specific
15 files. I may have looked at like a list of the files,
16 the names that we had, you know, jotted down to know
17 what cases we had. That type of thing.
18     Q. And who is "we" that jotted down names of
19 cases?
20     A. One of the secretaries.
21     Q. The next exhibit has been marked as Exhibit 6,
22 and that is the supplemental answers to
23 interrogatories.
24        And if you will look on the last page, is that
25 your signature?

Page 24

1      A. Yes.
2      Q. And what did you do to make sure that all the
3  answers to these interrogatories were true before you
4  signed the verification?
5      A. Well, I would look at the question and try and
6  verify the information.
7      Q. Did you look at any documents in attempting to
8  verify the information?
9      A. I don't know. I don't remember all the
10 questions to the interrogatories, so I don't know, you
11 know.
12     Q. This was signed only on the 29th day of July.
13 That was last week, and you don't recall what you did
14 last week as far as verifying these?
15     A. Well, I think we have been working on this for
16 a while, so I don't think we just had it for like a
17 week and then put it all together. I mean, some of the
18 information, you know, I know off the top of my head.
19     Q. Okay. The next exhibit is Plaintiffs' Exhibit
20 7, and this is -- this is a package of items that I
21 downloaded from the State of Connecticut Judicial
22 Branch.
23        Are you familiar with the fact that case
24 records are accessible on the computer from the State
25 of Connecticut Judicial Department?

Page 25

1      A. I think so. I have been on this web site.
2      Q. These represent the case detail for four of
3  the plaintiffs.
4         Does the case detail look accurate?
5         MR. SILBERBLATT: Has he ever seen these
6  documents before?
7      A. I haven't, no.
8         MS. FAULKNER: That wasn't my question.
9  Please don't interrupt.
10        BY MS. FAULKNER:
11     Q. Does the case detail look accurate?
12        MR. SILBERBLATT: Objection.
13     A. I don't know.
14        BY MS. FAULKNER:
15     Q. Do you know that Arrow sued Mr. Petrolito?
16     A. I believe that is one of the cases that we put
17 into suit for ours, yes.
18     Q. Did Arrow sue Kelly Jackson, which is page 2?
19     A. I believe so.
20     Q. And did Arrow sue Kathleen Strozeski, which is
21 page 3?
22     A. I believe so.
23     Q. And did Arrow sue Montville, Janet Montville?
24     A. I believe so.
25     Q. Down at the bottom of the page, there are

7 (Pages 22 to 25)

Brandon Smith Reporting Service

4dd6f8e5-c31d-4ad8-96eb-79ec7d9409c4

Page 26

1   motions, pleadings, objections.
2       As far as you know, is that an accurate record
3   of the docket?
4       A. I have no idea what it means. I am sorry.
5       Q. If you look in the middle where it says,
6   "Parties' Attorneys," it says, "Michael Ricigliano."
7   Is that you?
8       A. That is me.
9       Q. On the second page, Kelly Jackson indicates
10  that you filed a motion to withdraw your appearance
11  about a year ago.
12      A. On the second page? Yes.
13      Q. And that motion has not been granted, is
14  that --
15      A. I am not sure.
16      Q. -- how it appears?
17      A. I don't know. I am not sure.
18      Q. On the third page, it indicates that in
19  Ms. Strozeski's case, your motion to withdraw your
20  appearance was granted; is that correct?
21      A. I am not sure. I mean, it says on the piece
22  of paper it has been. I am not sure. We made -- I
23  don't know how many motions, but I believe we made
24  motions to withdraw on every case that we had for
25  Arrow, so specifically what -- I am not sure. It says

Page 27

1   so, but I --
2       Q. On the Petrolito case, there is no indication
3   that you made a motion to withdraw; is that correct?
4       A. I don't know.
5       Q. Is there anything special about the Petrolito
6   case that you might not have been given permission to
7   withdraw that case?
8       A. No.
9           MR. SILBERBLATT: Objection.
10          BY MS. FAULKNER:
11      Q. We will go back to Plaintiffs' Exhibit 1, and
12  this was a notice of a knowledgeable person designated
13  by your firm, and examination is described in the
14  second paragraph.
15      Are you the person designated by your firm?
16      A. Yes.
17      Q. And are you familiar with all of the items
18  listed in the second paragraph?
19      A. As much as anyone in my firm, yes.
20      Q. Is there anyone else in your firm that would
21  be also familiar with the items designated in the
22  second paragraph?
23      A. No.
24      Q. Did you have some kind of meeting or authority
25  from your firm that would authorize you to speak for

Page 28

1   the firm?
2           MR. SILBERBLATT: Objection.
3       A. In relation to?
4           BY MS. FAULKNER:
5       Q. In relation to this deposition.
6       A. Yes.
7       Q. And was that a meeting with the partners?
8       A. No.
9       Q. What constituted the meeting?
10      A. There was no meeting. It was not a meeting
11  with partners to decide who was coming up for this
12  deposition.
13      Q. How did you get designated by the firm as the
14  person most knowledgeable?
15      A. Because I was the person who was handling the
16  Arrow cases.
17      Q. Were you the only one among the partners who
18  was handling the Arrow cases?
19      A. Yes, ma'am.
20      Q. And was that -- the Arrow cases, was that a
21  business that you brought in yourself?
22      A. Yes, ma'am.
23      Q. How did you happen to bring in the Arrow
24  cases?
25      A. I spoke with Michael Valentino.

Page 29

1       Q. How did you know Michael Valentino?
2       A. He is a friend of mine.
3       Q. How long have you known Michael Valentino?
4       A. Eight years.
5       Q. What was the basis for your friendship?
6       A. We play golf together.
7       Q. I thought he was located in Chicago.
8           MR. SILBERBLATT: Is that a question?
9           MS. FAULKNER: Yes.
10          BY MS. FAULKNER:
11      Q. Is he not located in Chicago?
12      A. I know Arrow's offices are in Chicago. He has
13  an office on Long Island.
14      Q. So Mr. Valentino is actually at the Rockville
15  Center location; is that correct?
16      A. At times he is.
17      Q. Has your firm done any other business for
18  Arrow other than these collection matters?
19      A. No.
20      Q. Do you know Don Lupo?
21      A. I have met Don Lupo, I believe, yes.
22      Q. Was Don Lupo involved in any of those
23  discussions leading up to your entry into the
24  agreement?
25      A. Not that I can recall.

### Page 46

1  MR. SILBERBLATT: By counsel, he means in
2  another lawsuit not involving these plaintiffs, but
3  involving the Srowros, which Ms. Faulkner is familiar
4  with, there was an informal claim for indemnification,
5  but not a -- if by "claim" you mean a cross claim in
6  the formal sense -- are you referring to claim in
7  general?
8  MS. FAULKNER: Yes. In other words, have you
9  given them notice that you are going to seek
10 indemnification as a result of --
11 MR. SILBERBLATT: -- these lawsuits?
12 MS. FAULKNER: Arrow. The Arrow
13 representation.
14 A. Not, you know, nothing of any -- just on the
15 one Srowro case, but nothing like a written notice
16 saying as far as I know.
17 BY MS. FAULKNER:
18 Q. Has Arrow given you any notice that it is
19 going to hold you or your firm liable?
20 A. No. As far as I know, no.
21 Q. So as a result of your actions, have you
22 reported the situation to your malpractice carrier?
23 MR. SILBERBLATT: Objection. You can answer
24 the question.
25 A. If you mean in regards to the lawsuits that

### Page 47

1  are against my firm, I have reported them to my
2  malpractice carrier and my attorneys, sitting to my
3  right.
4  BY MS. FAULKNER:
5  Q. Right. However, usually, when you apply for
6  renewal of the insurance, you have to say are you aware
7  of any possible claims, and that is what I mean.
8  Have you notified your carrier that Arrow may
9  or may not seek indemnity by reason of your actions?
10 A. I don't know.
11 Q. Can you find that out?
12 MR. SILBERBLATT: This witness may not be the
13 one who corresponds with the malpractice insurance
14 carrier.
15 MS. FAULKNER: That's correct. I said can he
16 find out.
17 A. I will ask. Sure.
18 BY MS. FAULKNER:
19 Q. Now we are going to look at Exhibit 5, which
20 is your affidavit in support of your motion to dismiss.
21 Look at paragraph 4, please. It says that
22 your firm is a four attorney law firm.
23 Who are the four attorneys again?
24 A. Four partners; myself, Joe Margiotta, my
25 father, and Ellen Savino.

### Page 48

1  Q. Is there a William Margiotta?
2  A. No. Not that I know of.
3  Q. Is there a Stephen Brown?
4  A. Not anymore. He left the firm two, three
5  years ago.
6  Q. Was he a partner?
7  A. No.
8  Q. Is there an of counsel?
9  A. There are of counsel, yes.
10 Q. Who are of counsel?
11 A. Frank Bennetta and Nicholas Massimo.
12 Q. Are these active attorneys or former
13 attorneys?
14 A. They are active. They do criminal work.
15 Q. So that those two are of counsel to you for
16 purpose of the firm's criminal work; is that correct?
17 A. Yes.
18 Q. And of the attorneys who are there other than
19 the of counsel, is everyone full time?
20 A. Yes. You mean the four partners, are they
21 full time?
22 Q. Yes.
23 A. Yes.
24 Q. And how is compensation determined among the
25 four partners?

### Page 49

1  MR. SILBERBLATT: Objection.
2  A. I have no idea.
3  BY MS. FAULKNER:
4  Q. Do you know what your percentage is?
5  MR. SILBERBLATT: Objection.
6  A. My percentage of what?
7  BY MS. FAULKNER:
8  Q. Of the partnership net.
9  A. I don't even know if I have a percentage of
10 the partnership.
11 Q. You get income every year from the
12 partnership?
13 A. That's correct.
14 Q. Do you know how that is calculated?
15 MR. SILBERBLATT: Objection.
16 A. No. I get a check, and it is a check every
17 month or every week. There are bills to pay.
18 Sometimes you don't get a check. That is kind of how
19 it works.
20 BY MS. FAULKNER:
21 Q. Do you get a percentage of business that you
22 bring in?
23 A. No.
24 Q. Is there any kind of a reward for bringing in
25 business?

Case 3:02-cv-01423-MRK    Document 77-2    Filed 11/07/2003    Page 5 of 8

Cashman vs. Ricigliano
8/5/2003                                                              Michael Ricigliano, Esq.

Page 50

1  A. Pat on the back. That is about it.
2  Q. And is Ellen Savino related to any of the
3  other partners?
4  A. No.
5  Q. According to your K-1, she gets about double
6  what everyone gets. Why is that?
7  A. I don't know.
8  Q. Is she a managing partner?
9  A. No.
10 Q. Does she do more of the work?
11 A. I don't know if she does more of the work.
12 Everyone has different jobs.
13 Q. How are the -- how are the jobs allocated
14 among your partners?
15 A. Well, among your firms, I don't know if it is
16 an allocation. It is to the best. It is what it is,
17 you know.
18     Ellen handles the real estate with me. She is
19 -- we are both partners. She kind of runs the real
20 estate department.
21     My father handles zoning, and Mr. Margiotta
22 doesn't do any law work and hasn't done so in, I would
23 say, probably 30 or 40 years.
24 Q. So why is he still getting paid by the firm?
25 A. Because he brings in a lot of business. He is

Page 51

1  one of the founding partners, and that is his job is to
2  bring in rain, which he does.
3  Q. So that really, there is only three active
4  attorneys and one rainmaker?
5  A. Yes, that's correct.
6  Q. When you talk about real estate, do you mean
7  closings?
8  A. Yes. We do real estate closings. We do
9  zoning.
10 Q. Well, you said somebody else in the firm does
11 zoning.
12 A. Yes, but real estate is zoning, land use.
13 Q. I am looking at what you do as far as real
14 estate.
15 A. Okay.
16     MR. SILBERBLATT: You meaning him individually
17 or you meaning the firm?
18 A. Yes. Real estate closings.
19     BY MS. FAULKNER:
20 Q. And how many closings a week do you generally
21 do?
22     MR. SILBERBLATT: What time frame are we
23 talking about?
24     BY MS. FAULKNER:
25 Q. How many closings a week do you generally do?

Page 52

1      MR. SILBERBLATT: Objection.
2  A. Well, it depends. We represent banks, so you
3  have those real estate closings, and then I have
4  individual clients, and then whenever their closing
5  comes up, I will handle those closings.
6      BY MS. FAULKNER:
7  Q. You said you represent banks. Is Sterling
8  Bank one of the ones?
9  A. Yes.
10 Q. What other banks?
11 A. Fleet, Citibank, Green Point, Astoria. A few
12 others. We are on, you know, lists, closing lists.
13 Q. Do you do anything other than closings for
14 those banks?
15     MR. SILBERBLATT: The "you" individually in
16 these questions is him or his firm?
17     MS. FAULKNER: Either one.
18 A. That is mostly the crux. We used to do
19 foreclosure work maybe six, seven years back for
20 savings -- prior to them being taken over by Astoria.
21 But after that, we don't do that anymore.
22     BY MS. FAULKNER:
23 Q. You said in your affidavit, if you look at the
24 top of page 4, that you have handled 1,200 legal
25 matters. What --

Page 53

1      MR. SILBERBLATT: Objection. It says, "more
2  than."
3      BY MS. FAULKNER:
4  Q. What does "legal matters" mean?
5  A. Well, real estate closing.
6  Q. Would each closing be counted as a matter?
7  A. I believe so, yes.
8  Q. Tax research, is that a legal proceeding?
9  A. Yes. Tax grievance on your home.
10 Q. That has to be filed in court; is that
11 correct? Or appealed to the court?
12 A. Yes, yes.
13     MR. SILBERBLATT: I don't know if the witness
14 was finished with his answer.
15 A. It is in the affidavit.
16     BY MS. FAULKNER:
17 Q. How did you develop these numbers that are in
18 the affidavit?
19     MR. SILBERBLATT: Objection to the form.
20 A. I had the secretaries kind of go through the
21 computers, and you know, we are not very sophisticated
22 in terms of technologically speaking, so some of the
23 stuff is on computer. Some stuff is, you know -- you
24 may have in the files, you know. That type of stuff.
25 That is how we computed it.

| | | | |
|---|---|---|---|
| 12 | they had been assigned. | 12 | Q. You don't know how you got — |
| 13 | MR. SILBERBLATT: Complaints. | 13 | A. Well, we keep a list of the files that went |
| 14 | BY MS. FAULKNER: | 14 | out, files that went out in terms of into suit. So |
| 15 | Q. What I am just getting at here is you made | 15 | that is the number. I don't know that is where I would |
| 16 | this affidavit quite a bit of time after you filed | 16 | have gotten the number from. |
| 17 | those complaints. Does "supposedly" mean that you are | 17 | Q. Who keeps the list? |
| 18 | now not sure that the assignments took place? | 18 | A. It is on the computer. It is not anyone |
| 19 | MR. SILBERBLATT: Sitting here today? | 19 | specifically. It is on a computer that I have access |
| 20 | Objection. | 20 | to that everyone in my office has access to. |
| 21 | BY MS. FAULKNER: | 21 | Q. And could you also go to your file cabinet and |
| 22 | Q. No. Not sitting here today. When you signed | 22 | count the number of manila folders that are in there? |
| 23 | this affidavit. | 23 | A. No. Because files that may be in the file |
| 24 | A. I don't think I can answer the question due to | 24 | cabinet at that time may not have been put into suit. |
| 25 | privilege. I mean, I am not going to answer the | 25 | They may have been just files we got in that were put |

Page 63                                                                                                         Page 65

| | | | |
|---|---|---|---|
| 1 | question because I think it is privileged information. | 1 | together. |
| 2 | Q. You have put this on a public file. This is | 2 | Q. You also say somewhere that you sent 90 |
| 3 | in a court record. You have waived any privilege as to | 3 | letters out to people. |
| 4 | this. | 4 | A. Okay. |
| 5 | A. I disagree. I am sorry, Ms. Faulkner. As an | 5 | Q. What is the difference between the number of |
| 6 | attorney, I am not going to answer the question. | 6 | letters that you sent out and the lower number of suits |
| 7 | I think any conversations I have had with | 7 | that you filed? |
| 8 | Arrow while they were my client and after I can't | 8 | MR. SILBERBLATT: What accounts for the |
| 9 | disclose. | 9 | difference? |
| 10 | Q. I am not asking you to disclose any. I am | 10 | MS. FAULKNER: Yes. |
| 11 | asking you why you used the word "supposedly." | 11 | A. I think probably the actions you brought |
| 12 | Did you have personal doubt at the time you | 12 | against Arrow would have made the change, the |
| 13 | signed this affidavit as to the debts having been | 13 | difference. The lawsuit you brought against Arrow. We |
| 14 | assigned? | 14 | didn't put anything else. We kind of just -- you sent |
| 15 | MR. SILBERBLATT: For the record, the | 15 | me a letter, and after that point in time, I didn't |
| 16 | agreement was drafted by counsel and Mr. Ricigliano | 16 | do -- I really didn't do anything because I wanted to |
| 17 | signed it. | 17 | find out what was happening. |
| 18 | A. I am not -- I am sorry -- | 18 | BY MS. FAULKNER: |
| 19 | MR. SILBERBLATT: If I can be of some | 19 | Q. And when did I send you a letter? |
| 20 | assistance. | 20 | A. A while ago. |
| 21 | She is only asking you what you understood | 21 | Q. You put most of these accounts into suit in |
| 22 | this term to mean when you signed this affidavit. That | 22 | December, January, February, correct? |
| 23 | is all she is asking you, as I understand it. | 23 | A. I don't know. I am not sure. |
| 24 | THE WITNESS: Neil, I have to confer with you | 24 | Q. Would the difference in numbers be accounted |
| 25 | on this. | 25 | for by people who agreed to pay without filing suit? |

17 (Pages 62 to 65)

Brandon Smith Reporting Service

4dd6f8e5-c31d-4ad8-96eb-79ec7d9409c4

Page 66

```
12      A. We might have said, "Send ----,"
13   I don't know.
14      BY MS. FAULKNER:
15      Q. So that anything that was sent directly to
16   Arrow you would still be entitled to your percentage
17   on; is that correct?
18      A. No. Not if we are not the attorneys of
19   record. I don't know. I have not really researched
20   it. I have no idea.
21          Most of the people, if they were going to pay
22   it, would go on a stipulation that -- normally, the
23   stipulations were not two-year stipulations, you know.
24   So I don't know if Arrow is getting any money from
25   anyone. I have no idea. I don't know when the last
```

Page 68

```
13         MS. FAULKNER: Paragraph 14.
14   When we have our lunch, I will replace these
15   two pages.
16      BY MS. FAULKNER:
17      Q. It says you received less than $317 as a
18   result of your legal services.
19         MR. SILBERBLATT: For the year ending?
20      BY MS. FAULKNER:
21      Q. December 31, 2001.
22      A. I know we didn't -- I am not sure what the
23   exact number is. I know we didn't make really any
24   money on the files.
25      Q. And then page 6 says for the year ending
```

Page 67

```
 1   check Arrow got from anyone was.
 2      Q. According to your agreement, they are supposed
 3   to account to you for any payments they get directly.
 4   Are you saying they have not accounted to you
 5   for any payments they have received?
 6      A. Yes. I don't really have any correspondence
 7   with them whatsoever.
 8      Q. Would any of the difference between the suits
 9   filed and the letters be accounted for by bad
10   addresses?
11      A. I don't know. I know some people probably
12   weren't living from the last known address, but I don't
13   know.
14      Q. Weren't you required to file suit under the
15   agreement within 45 days after you got the file?
16      A. If it -- yes. Probably under the agreement.
17      Q. But you are just saying you didn't?
18      A. No. We did not file all suits out of the -- I
19   guess the 90 that we sent demand letters on.
20      Q. You said you did make a profit of some 300 and
21   some dollars on the Arrow suits.
22          What did you consult to reach that figure?
23          MR. SILBERBLATT: What are you referring to?
24          MS. FAULKNER: There is a net profit figure in
25   here somewhere. Paragraph 14.
```

Page 69

```
 1   December 31, 2002, you made $3,000?
 2      A. Okay.
 3         MR. SILBERBLATT: $3,010.
 4      BY MS. FAULKNER:
 5      Q. Where did you get those figures?
 6      A. Probably from one of the secretaries who does
 7   the bookkeeping. Yes.
 8      Q. Does the secretary or bookkeeper have those
 9   figures somewhere that could be printed out?
10      A. She probably has them somewhere. I don't know
11   if she prints them out or keeps a ledger. I am not
12   sure.
13      Q. Well, I would like a ledger or a printout or
14   whatever you used to reach these figures of $3,017.
15      A. If my counsel has no objection to it.
16         MR. SILBERBLATT: Put that in. Make a
17   notation or keep a separate page, if you would, at the
18   end of the transcript.
19         MR. SILBERBLATT: The total income for those
20   paragraphs is the tax returns, which I believe you
21   have.
22         MS. FAULKNER: They are not reflected on the
23   tax returns. I cannot figure how you --
24         MR. SILBERBLATT: 705,000 and the other total
25         MS. FAULKNER: I cannot figure how you got to
```

18 (Pages 66 to 69)

Brandon Smith Reporting Service

4dd6f8e5-c31d-4ad8-96eb-79ec7d5

Cashman vs. Ricigliano

8/5/2003                                                                                Michael Ricigliano, Esq.

Page 70

1  those.
2      BY MS. FAULKNER:
3      Q. Let's turn to Exhibit 6. Have you got that?
4      MR. SILBERBLATT: Which one is that?
5      BY MS. FAULKNER:
6      Q. This is your supplemental interrogatories. If
7  you will, turn to page 8.
8      You have given me a list of persons against
9  whom you filed lawsuits. It is not in any kind of
10 alphabetical order. Can you explain that?
11     A. That might have been just how we got them in.
12     Q. It does not have first names on most of them,
13 or half of them anyway. Can you explain that?
14     A. No.
15     Q. I cannot count up to 48. Can you explain
16 that?
17     A. No.
18     Q. Are there only 47?
19     MR. SILBERBLATT: There may have been an error
20 in arithmetic on my part.
21     BY MS. FAULKNER:
22     Q. That was signed under oath by you,
23 Mr. Ricigliano?
24     A. Yes.
25     Q. And you did not check the accuracy of that?

Page 71

1      A. Whether it was -- I did not count whether it
2  was 47 or 48.
3      Q. Do you know whether it is 47 or 48?
4      A. I am not sure.
5      Q. Did you talk with Lance Martin about the
6  representation of Arrow before entering into the
7  retainer agreement?
8      A. I don't know.
9      Q. Do you know who Lance Martin is?
10     A. Yes.
11     Q. Who is he?
12     A. At the time, I believe he was general counsel.
13 I don't know if he still is general counsel to Arrow.
14     Q. In paragraph 6, you mention that you got two
15 each of these documents which have been marked as
16 Plaintiffs' Exhibit 4.
17     Is there any reason why you got two of those?
18     MR. SILBERBLATT: It refers to one for Cashman
19 and one for Montville.
20     MS. FAULKNER: Yes. There are two each that
21 you got in every file.
22     MR. SILBERBLATT: No. You misunderstand.
23 That doesn't say two each. It says two affidavits; one
24 affidavit for Cashman. One affidavit for Montville.
25     BY MS. FAULKNER:

Page 72

1      Q. Okay. So that is not an accurate statement
2  either; is that correct?
3      You received one affidavit and one transaction
4  summary in each case; is that correct?
5      A. I believe so.
6      Q. Would you turn to interrogatory 15.
7  Previously in the interrogatories, I believe you said
8  you drafted the letter that was sent to each of the
9  Arrow customers.
10     A. Yes.
11     Q. And interrogatory 15 asks for each creditor on
12 whose behalf the form letter was sent. In other words,
13 was that form letter sent on behalf of anyone other
14 than Arrow? Has it been used in anybody's collection
15 other than Arrow?
16     A. I don't think so.
17     Q. Do you have any way of finding that out?
18     A. I can ask.
19     Q. You will let me know?
20     MR. SILBERBLATT: Put that down.
21     A. Sure. You are meaning another company that we
22 represented? Did we send out that letter just with the
23 different heading to someone else?
24     BY MS. FAULKNER:
25     Q. Right. I am going to show you what has been

Page 73

1  marked as Plaintiffs' Exhibit 9.
2      Did I show you that already?
3      A. I don't think so.
4      Q. Is that, as far as you know, the complete
5  court file of the Christopher Cashman case?
6      A. I have no idea.
7      MR. SILBERBLATT: The court file or the
8  complaint?
9      MS. FAULKNER: I thought you gave me the court
10 file. No?
11     MR. SILBERBLATT: I don't -- I gave you
12 whatever my client gave me to give you --
13     MS. FAULKNER: All right.
14     MR. SILBERBLATT: -- in focusing on this
15 question. That is all.
16     BY MS. FAULKNER:
17     Q. Then this is the summons and complaint as
18 filed in the Cashman matter?
19     A. May I take a break?
20
21     (Recess taken: 11:42 a.m. to 11:44 a.m.)
22
23     (The last question was read back.)
24
25     MR. SILBERBLATT: Is this the summons and

19 (Pages 70 to 73)

Brandon Smith Reporting Service

4dd6f8e5-c31d-4ad8-96eb-79ec7d9409c4